UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

98-0359

CASE NO. CIV-MOORE

MAGISTRATE JUDGE TURNOFF




PEGGY MATHIESON,
a Florida resident,

Plaintiff,

v.

DADE COUNTY FEDERAL CREDIT UNION, a Florida corporation,

Defendant.

**COMPLAINT**

Plaintiff, PEGGY MATHIESON, sues Defendant, DADE COUNTY FEDERAL CREDIT UNION, and alleges as follows:

**JURISDICTION AND VENUE**

1. This is an action for sex discrimination, including sexual harassment in the workplace, and retaliation. Plaintiff seeks money damages to redress violations of the Florida Civil Rights Act of 1992, Florida Statutes § 760.01 et seq., the Civil Rights Act of 1991, 42 U.S.C. § 1981a et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2. Plaintiff was required to work in a sexually hostile atmosphere and suffered retaliation when she exercised her protected rights. She seeks compensatory damages, including back pay, benefits and front pay, and punitive damages.

3. Plaintiff has been a resident of Miami-Dade County, Florida at all material times.

4. Defendant, DADE COUNTY FEDERAL CREDIT UNION ("DCFCU"), is a Florida corporation with its principal place of business in

Miami-Dade County, Florida. At all times material hereto, Defendant employed more than 50 persons and it is an "employer" as envisioned by Florida Statutes §§ 448.101(3) and 760.02(7) and 42 U.S.C. § 2000e(b).

**GENERAL ALLEGATIONS**

5. Plaintiff is a female formerly employed by DCFCU as its Vice President of Marketing. Plaintiff worked for DCFCU from November 1987 until she was constructively discharged in June 1995.

6. From 1991 until she left her position with DCFCU, Plaintiff was regularly subjected to sex discrimination, including sexual harassment, primarily perpetrated by DCFCU's President, Steve Wiltse, and its Vice President of Finance, Scott Weiss.

**The Atmosphere of Hostility Towards Women**

7. Throughout the 1990s, DCFCU has been permeated with an atmosphere of hostility towards women. For instance, beginning in 1990, Wiltse regularly told Plaintiff, in an angry, threatening tone, that he "would never hire a woman again in a management position." Wiltse said to Plaintiff, "I hire women because they are work horses and you can manipulate them and work them to death."

8. The management of DCFCU was utterly unconcerned with sexual harassment. DCFCU's Vice President of Finance, Dave Miller, was only forced to resign in 1991 after years of complaints of sexual harassment, and then solely because charges were finally brought by a woman after he exposed himself to her. Miller was



LAW OFFICES ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
OFFICE IN THE GROVE, 2699 SOUTH BAYSHORE DR., PENTHOUSE, MIAMI, FL. 33133 / TEL: (305) 858-2900 / TELEFAX: (305) 858-5261

replaced by Weiss, who became a leader in continuing the harassment.

9. Throughout Plaintiff's tenure with DCFCU in the 1990s, women in the workplace were regularly referred to by Wiltse and/or Weiss with derogatory gender-related terms, such as the following: bitch, security bitch, fat bitch, red-headed bitch, skinny bitch, professional bitch (their term for Plaintiff), dike, cunt, fucking cunt, whore.

10. Management discussed and questioned female clerical employees regarding their sex lives on a daily basis in front of observers. They made sexual comments to them, such as, "I can tell what kind of sex you had last night by the way you're walking. Was it from the rear?" When a female employee was out sick, Weiss said, "Her pussy is sick. But I don't know how she would know, she never uses it."

11. In 1991, Plaintiff was advised of Weiss' plan to replace DCFCU's Vice President of Lending, Michelle Notaro, because she would not cooperate with his "blind loyalty" policy. She was complaining about Weiss' sexual comments and harassment. Plaintiff witnessed terrible abuse directed towards Notaro. When Wiltse realized Plaintiff was friends with Notaro, he began to pit them against each other, going back and forth to their offices "repeating" stories and lies about each other so they would not be allies. Plaintiff was told to stay away from Notaro, who resigned due to the harassment in 1991.



LAW OFFICES ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
OFFICE IN THE GROVE, 2699 SOUTH BAYSHORE DR., PENTHOUSE, MIAMI, FL. 33133 / TEL: (305) 858-2900 / TELEFAX: (305) 858-5261

12. In 1992, Plaintiff was informed by Wiltse of his plan to move Jan Watson, DCFCU's Vice President of Operations, to the Vice President of Lending position so that she could be deliberately set up to fail and consequently have a justification to fire her. Wiltse and Weiss planned this because Watson was considered a threat and could no longer be controlled by them. She too was tiring of the intimidation, discrimination, and harassment. Plaintiff was told not to cooperate with her, not to speak to her and to assist their plan. One year later, Watson was terminated but rehired two days later by the DCFCU's Chairman of the Board of Directors after a private meeting. She was rehired as a data entry clerk at a distant branch office location and was no longer permitted to attend staff meetings, receive phone calls, have staff contact, and was not even included on the staff roster.

13. Management conducted daily coffee breaks at Top Hat Restaurant to discuss which employee's life they were going to "mess with next", particularly singling out single mothers with children for relocation or transfer to a branch office the longest distance from their home. They would call last minute staff meetings for 7:00 a.m., notifying the primarily female staff at 4:00 p.m. the day before. This was done deliberately and laughed about. Plaintiff was told to be a part of these "meetings" and to keep her mouth shut.

14. In 1993, Plaintiff could no longer deal with these meetings emotionally or professionally. She objected to the gender discrimination and harassment and refused to attend or participate



LAW OFFICES ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
OFFICE IN THE GROVE, 2699 SOUTH BAYSHORE DR., PENTHOUSE, MIAMI, FL. 33133 / TEL: (305) 858-2900 / TELEFAX: (305) 858-5261

further. It was at this time that she, too, became "the enemy" and "a threat." Intensified harassment directed towards Plaintiff in particular began as a result. Examples of discriminatory conduct directed towards Plaintiff are discussed below.

**Retaliation and Discrimination Directed Towards Plaintiff**

15. Plaintiff was shunned, ignored, excluded from management decisions and kept uninformed. When she asked Wiltse about this behavior, Plaintiff was told that she wasn't loyal enough to him and that he thought she was "after his job", but that he would "make sure that [Plaintiff] didn't get it, ever."

16. Plaintiff was told that as part of loyalty, she was expected to keep her mouth shut and cover up issues whenever Wiltse deemed necessary. He would leave for extended vacations and not advise Plaintiff. Consequently, she was unable to do her job because Wiltse was her supervisor and Plaintiff could not begin or complete projects which would affect her budget numbers. Plaintiff approached Wiltse after one specific vacation and expressed her concern about this issue. His response was, "That's your problem. Get out of my office."

17. In 1993, Plaintiff's fiancee (and now husband) was turned down for a loan increase on his line of credit, even though he qualified according to DCFCU loan guidelines. The Vice President of Lending at that time, Robert Banderas, expressed concern about this to Plaintiff and then brought the situation to upper management's attention. He was told by Wiltse that the loan had to go to the Board of Directors for approval because he was

"management family." Mr. Banderas said that this was not loan policy.

18. As a result, Mr. Banderas was sent harassing and threatening memos to do what he was told and not get involved in this situation. He then received a "newly amended" policy change from Wiltse reflecting this issue. The policy change was never submitted to the Board for approval as required by regulations. Plaintiff's fiancee never received the loan.

19. As a further act of discrimination, Plaintiff's computer security levels were removed in 1994. When Wiltse and Weiss left town for a meeting, Plaintiff could not perform duties required for DCFCU operations.

20. It was the responsibility of Plaintiff's department, marketing, to produce the employee newsletter and a common practice was to put an article in the employee newsletter about policies and procedures. A Sexual Harassment Policy had just been established - almost three years after Dave Miller was terminated for sexual harassment. An outline of this policy was put in the June 1994 newsletter. As a result, Plaintiff received a reprimand memo from Wiltse in which he said, "Why has the topic of sexual harassment reared it's ugly head again?" She was told not to print the article in the newsletter.

21. In December 1994, Wiltse came into Plaintiff's office and threw the Hay Group analysis results package on her desk and said, "There's a Board meeting on Monday to review this. You should be there." The Hay Research Group was hired to coordinate and develop

an evaluation of job positions, responsibilities and pay compensation.

22. At the Board meeting, the recommendations were presented to the Board as a "management decision", even though Plaintiff was excluded from the decision. Up on the screen, for all to see and unknown to Plaintiff, was a recommended downgrade and cut in pay for her position. Wiltse was the only person to evaluate Plaintiff's position with Hay Research Group. The Board began to question this recommendation. There was a confrontation and all DCFCU management employees were told to leave the room, including Wiltse. Shortly thereafter, the Board announced that it was keeping Plaintiff's salary and position at the same level.

23. After this, in January 1995, Plaintiff was removed from her private office in the administrative area (next to Wiltse and directly across from Weiss) to an area on the other side of the building, which was an open area with no partitions and a main traffic area for employees. Plaintiff was not given a computer or printer and had no access to clerical staff. Her old office remained vacant until her departure in June 1995.

24. On February 8, 1995, Plaintiff was asked by Ed Paula (the contractor for DCFCU's new building) to meet with him. He revealed to Plaintiff that he was concerned about some things he had heard said about her by DCFCU's senior management. He wanted her to be aware of their animosity and to be careful, saying "they're out to get you." He said that the previous week, he was touring the new headquarters building with Wiltse, Weiss and Cathy Raymond, Vice

President of Operations. While touring the marketing department office area, a discussion began regarding the interior designer's recommendation to place a $4,500 leather couch in the marketing department's reception area. Weiss said, "No way. She's not getting that couch. I've never screwed on a $4,500 couch and neither is her ass." He added, "She thinks everybody wants her ass." Neither Wiltse nor Raymond made any attempt to stop him or reprimand him. Instead, they "snickered", according to Mr. Paula.

25. During this same conversation, Mr. Paula told Plaintiff that during previous planning meetings about the new building, it was said by these three to the interior designer and contractor that they wanted Plaintiff's office isolated from the rest of management. Further, they wanted Plaintiff to have cheap or used furniture. They also requested that one of her office doors adjacent to the administrative suite be permanently sealed off so that she would not have easy access to management. The contractor advised them that this was a fire door and was required by law. They still wanted it sealed off and he told them it could not be done.

26. After receiving this information, Plaintiff confronted Wiltse. They met on February 13, 1995 and Plaintiff reviewed with him what she had been told by Mr. Paula, though she never mentioned his name. Wiltse's first reaction was to turn his head to the side to hide his grin. He did not deny that it had occurred. He said, "I just don't know what to do with Scott [Weiss]. Maybe when we hire a Human Resource Director, that person could control Scott's



LAW OFFICES ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
OFFICE IN THE GROVE, 2699 SOUTH BAYSHORE DR., PENTHOUSE, MIAMI, FL. 33133 / TEL: (305) 858-2900 / TELEFAX: (305) 858-5261

behavior." Plaintiff then said that something must be done to stop this behavior. Wiltse shrugged his shoulders and said he did not know what to do about it. He ended the conversation.

27. On February 17, Plaintiff met with Maria Ortega, DCFCU's internal auditor, to review the intolerable situation with her. Ms. Ortega was designated to handle employee complaints or problems if their supervisor does not respond satisfactorily. She advised Plaintiff that the only thing she could do was to write the incident up and put it in Plaintiff's personnel file. However, she reminded Plaintiff that the contents of her personnel file would surely come to the attention of Weiss and Wiltse. Ortega said that they would make Plaintiff's life a living hell.

28. Ortega also discouraged Plaintiff from taking the matter to the Board of Directors, saying that the Board knew there was a problem with Weiss and Wiltse and chose to ignore it and that Plaintiff would be taking a big risk by going to the Board. She said if Wiltse found out that Plaintiff went to the Board he would have her job.

29. Nonetheless, Plaintiff decided to take the risk and go to John Muncey, the Chairman of the Board. The Board had been aware of Wiltse's abusive nature and lack of suitability to be in a management position since at least 1987, but had failed to take any action against him.

30. On February 20, Plaintiff met with Muncey and relayed the entire story, plus many other issues about harassment, verbal abuse and discrimination towards the staff. He expressed concern and

said that he could not understand why Wiltse apparently disliked women. He said, "Scott hates everybody but Steve has a definite problem with women, particularly intelligent and attractive ones." Muncey said that he wanted to discuss this conversation with Sandie Briguera, the Vice Chairman of the Board, and he would get back to Plaintiff.

31. Two days later, Plaintiff met with Briguera at Muncey's request and reviewed all the issues with her. She too expressed concern and said that this behavior had to be stopped. She stated that there would have to be some major changes made with Wiltse and Weiss.

32. Muncey and Briguera set up a meeting between themselves, Wiltse, Ortega and Plaintiff for February 24. The intent of this meeting would be to put all "cards" on the table and iron out the difficulties. This meeting was extremely unpleasant and Wiltse was enraged and insulting towards Plaintiff.

33. Later in the afternoon, when Wiltse returned to his office, Plaintiff went in to try to talk with him. He told her, "I'm sick of hearing how intelligent and professional you are. Get out of my office." She left. Muncey and Briguera both called later in the day to express their apologies for Wiltse's behavior and to thank Plaintiff for bringing this situation to their attention. They said they knew it was bad but not this bad. They said that they told Wiltse that they wanted the two of them to talk this out and for him to improve his attitude and also to "come down on Scott [Weiss]."

34. Plaintiff met with Wiltse again on February 27 to attempt to talk things out, as had been recommended. During this meeting, Wiltse said, "You know our real problem is that our basic philosophies are different towards managing employees. You think there should be more understanding, consideration, and openness with employees and that they should be treated more as peers. My philosophy is if they don't do what I want them to, I make their lives miserable until they quit." The behavior of Wiltse and Weiss never changed and they were not disciplined in any manner by the Board.

35. The written and verbal harassment thereafter escalated from Wiltse. It was also directed towards Plaintiff's assistant, Heather Werd, and Ortega, the internal auditor, because of their perceived support of her. Harassment from Wiltse, designed to drive Plaintiff from DCFCU, continued unabated until Plaintiff turned in her resignation on June 15, 1995. For example, she received twelve memos in six weeks criticizing the performance of her department.

36. One of the last acts of harassment occurred during the first week of June 1995, when Wiltse told Ortega to do an audit for the annual meeting expenses for the last two years because the annual meeting budget had been exceeded by $1,755. Plaintiff was in charge of this project and had previously explained this overage in her annual meeting written report to Wiltse in April, two weeks after the conclusion of this project. In eight years, this is the first time he had asked for an audit of this expense or any expense

from the marketing department, which is unnecessary because the auditors include it in the general audit every year. No errors have ever been found or any questions asked regarding the annual meeting account. In her audit, Ortega concluded that the overage was justifiable because of an increase in members, postage, etc.

37. Wiltse was very angry that Ortega could not find anything wrong. He said he did not believe her and questioned her motives and loyalty. According to Ortega, he stormed out of her office.

38. Through their discrimination and retaliation, Wiltse and Weiss effectively prevented Plaintiff from performing her job duties. Eventually, Plaintiff also could no longer emotionally withstand the barrage of abuse directed towards her. She thus felt compelled to leave her position with DCFCU. Her last day was June 30, 1995.

39. At a meeting requested by the Board of Directors after her departure, Briguera asked Plaintiff if she thought Wiltse had a problem with women. Plaintiff answered "yes" and Briguera replied "I thought so." Chairman of the Board John Muncey added, "I don't know why he hates women so much."

40. All of this mistreatment of Plaintiff was a result of the extreme hostility that Wiltse and Weiss exhibit towards females in the workplace, as well as their desire to retaliate against Plaintiff for her refusal to participate in their wrongdoing.

41. Plaintiff filed a Charge of Discrimination jointly with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations on or about November 20, 1995.



LAW OFFICES ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
OFFICE IN THE GROVE, 2699 SOUTH BAYSHORE DR., PENTHOUSE, MIAMI, FL. 33133 / TEL: (305) 858-2900 / TELEFAX: (305) 858-5261

42. The EEOC issued Plaintiff a Notice of Right to Sue for her Charge of Discrimination on or about November 25, 1997. This action was filed within 90 days of the issuance of the right to sue notice.

43. All conditions precedent to the commencement of this action have either occurred, been waived or been excused.

44. Plaintiff has retained the undersigned counsel to prosecute this action and is obligated to them for reasonable attorneys' fees and costs in connection therewith.

**COUNT I - VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992, THE FEDERAL CIVIL RIGHTS ACT OF 1991 AND TITLE VII OF THE FEDERAL CIVIL RIGHTS ACT OF 1964**

**SEXUAL HARASSMENT**

45. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 44 as if fully set forth herein.

46. Plaintiff is a member of a protected group under the Florida Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964, i.e., she is a female. Plaintiff was sexually harassed at various different times and on a continuous basis through the creation by DCFCU of a sexually hostile atmosphere at her workplace, as more fully discussed above.

47. These actions are part of a continuing pattern of unwelcomed activity which the management of DCFCU exhibits towards female employees.

48. The actions described above:

a. constituted sexual harassment;



LAW OFFICES ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
OFFICE IN THE GROVE, 2699 SOUTH BAYSHORE DR., PENTHOUSE, MIAMI, FL. 33133 / TEL: (305) 858-2900 / TELEFAX: (305) 858-5261

b. created a sexually hostile atmosphere;

c. constituted conditions under which no reasonable person could continue to work; and

d. created an unsafe work place.

49. The sexual harassment to which Plaintiff was subjected was based upon her being female. Management of DCFCU did not engage in the same conduct towards male employees.

50. Plaintiff, by being subjected to the sexually hostile conduct and atmosphere created by DCFCU, was affected in the "terms, conditions, or privileges" of her employment under the Florida Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964 in that:

a. her psychological well-being was affected;

b. her compensation was reduced; and

c. the workplace became hostile.

51. The conduct of DCFCU deprived Plaintiff of her statutory rights under the Florida Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964.

WHEREFORE, Plaintiff, PEGGY MATHIESON, prays that this Court will:

a. issue judgment that the practices of Defendant, DADE COUNTY FEDERAL CREDIT UNION, are violative of Plaintiff's rights under the Florida Civil Rights Act of 1992, Florida Statutes § 760.01 et seq., the Civil Rights Act of 1991, 42 U.S.C. § 1981a et

seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.;

b. enjoin DCFCU from continuing or maintaining any policy, practice or custom of denying, abridging, withholding or conditioning the rights of employees on the basis of their sex, which rights are secured by the Florida Civil Rights Act of 1992, Florida Statutes § 760.01 et seq., the Civil Rights Act of 1991, 42 U.S.C. § 1981a et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.;

c. order DCFCU to remedy the sexual harassment against Plaintiff by:

i. paying appropriate back pay;

ii. paying pre-judgment interest;

iii. paying any other compensatory damages, including, but not limited to, damages, mental anguish, loss of dignity and any other intangible injuries, within the meaning of the Florida Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964;

iv. paying punitive damages; and

v. providing any other relief that is appropriate;

d. grant Plaintiff her costs and reasonable attorneys' fees pursuant to the Florida Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964;

e. grant such other and further relief as is just.



LAW OFFICES ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
OFFICE IN THE GROVE, 2699 SOUTH BAYSHORE DR., PENTHOUSE, MIAMI, FL. 33133 / TEL: (305) 858-2900 / TELEFAX: (305) 858-5261

**COUNT II - VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992, THE FEDERAL CIVIL RIGHTS ACT OF 1991 AND TITLE VII OF THE FEDERAL CIVIL RIGHTS ACT OF 1964**

**RETALIATION**

52. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 44 as if fully set forth herein.

53. Plaintiff's acts of complaining about the discriminatory conduct of Wiltse and Weiss were protected acts under the Florida Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964.

54. DCFCU's various punitive acts discussed above were motivated by Plaintiff's acts of complaining about discrimination and, as such, constitute unlawful employment practices within the meaning of the Florida Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964.

55. Plaintiff, by being subjected to adverse employment decisions that were improperly motivated by her protected acts, was affected in the "terms, conditions, or privileges" of her employment under the Florida Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964 in that:

a. her psychological well-being was affected;

b. her compensation was reduced; and

c. the workplace became hostile.

56. The conduct of DCFCU deprived Plaintiff of her statutory rights under the Florida Civil Rights Act of 1992, the Federal



LAW OFFICES ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
OFFICE IN THE GROVE, 2699 SOUTH BAYSHORE DR., PENTHOUSE, MIAMI, FL. 33133 / TEL: (305) 858-2900 / TELEFAX: (305) 858-5261

Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964.

WHEREFORE, Plaintiff, PEGGY MATHIESON, prays that this Court will:

a. issue judgment that the practices of Defendant, DADE COUNTY FEDERAL CREDIT UNION, are violative of Plaintiff's rights under the Florida Civil Rights Act of 1992, Florida Statutes § 760.01 et seq., the Civil Rights Act of 1991, 42 U.S.C. § 1981a et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.;

b. enjoin DCFCU from continuing or maintaining any policy, practice or custom of denying, abridging, withholding or conditioning the rights of employees on the basis of their complaining about acts of discrimination, which rights are secured by the Florida Civil Rights Act of 1992, Florida Statutes § 760.01 et seq., the Civil Rights Act of 1991, 42 U.S.C. § 1981a et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.;

c. order DCFCU to remedy the retaliation against Plaintiff by:

i. paying appropriate back pay;

ii. paying pre-judgment interest;

iii. paying any other compensatory damages, including, but not limited to, damages, mental anguish, loss of dignity and any other intangible injuries, within the meaning of the Florida



LAW OFFICES ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
OFFICE IN THE GROVE, 2699 SOUTH BAYSHORE DR., PENTHOUSE, MIAMI, FL. 33133 / TEL: (305) 858-2900 / TELEFAX: (305) 858-5261

Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964;

iv. paying punitive damages; and

v. providing any other relief that is appropriate;

d. grant Plaintiff her costs and reasonable attorneys' fees pursuant to the Florida Civil Rights Act of 1992, the Federal Civil Rights Act of 1991 and Title VII of the Federal Civil Rights Act of 1964;

e. grant such other and further relief as is just.

**JURY DEMAND**

57. Plaintiff hereby demands jury trial of all issues so triable.

Dated on this 19th day of February 1998.

ARAGON, BURLINGTON, WEIL
& CROCKETT, P.A.
Attorneys for Plaintiff
2699 South Bayshore Drive
Penthouse
Miami, Florida 33133
(305) 858-2900

By: ______________________
ROBERT K. BURLINGTON
Florida Bar No. 261882
DANIEL F. BLONSKY
Florida Bar No. 972169

# CIVIL COVER SHEET

98-0359

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

Peggy Mathieson

**DEFENDANTS** CIV-MOORE

Dade County Federal Credit Union

MAGISTRATE JUDGE TURNOFF

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Miami-Dade (EXCEPT IN U.S. PLAINTIFF CASES)

A Dade 98cv0359 | KMM | WCT

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Miami-Dade (IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

FILED by D.C. INTAKE
FEB 19 1998
CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. • MIAMI

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Daniel F. Blonsky, Esq. - (305) 858-2900
Aragon, Burlington, Weil & Crockett, P.A.
2699 S.Bayshore Dr., PH, Miami, FL 33133

ATTORNEYS (IF KNOWN)

(d) CIRCLE COUNTY WHERE ACTION AROSE: (DADE) MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Florida Civil Rights Act of 1992, Florida Statutes § 760.01 et seq., The Civil Rights Act of 1991, 42 U.S.C. § 1981a et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

IVa. 3 days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

**A CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- B ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**A REAL PROPERTY**
- ☐ 210 Land Condemnation
- B ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**A TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury—Med Malpractice
- ☐ 365 Personal Injury—Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- B ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**A CIVIL RIGHTS**
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**B PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- Habeas Corpus:
- * ☐ 530 General
- ☐ 535 Death Penalty
- * ☐ 540 Mandamus & Other
- ☐ 550 civil Rights

*A or B

**B FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**A LABOR**
- ☐ 710 Fair Labor Standards Act
- B ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- B ☐ 791 Empl. Ret. Inc. Security Act

**A BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**A PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**B SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**A FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**A OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- B ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- * ☐ 890 Other Statutory Actions

*A or B

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Refiled
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

Check YES only if demanded in complaint: JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) (See instructions): IF ANY

JUDGE ______ DOCKET NUMBER ______

February 19, 1998

DATE

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
S/F I-2
REV. 6/90

FOR OFFICE USE ONLY: Receipt No. 688243 Amount: 150.00

Date Paid: 02/19/98 M/ifp: ______